**ORECK CORPORATION,**
Plaintiff-Appellee,

v.

**WHIRLPOOL CORPORATION and
Sears, Roebuck and Co.,
Defendants-Appellants.**

**No. 1173, Docket 76–7631.**

United States Court of Appeals,
Second Circuit.

Argued June 3, 1977.

Decided Sept. 21, 1977.

Rehearing En Banc Granted Dec. 15, 1977.

Michael R. Turoff, Chicago, Ill. (Alvin K. Hellerstein, Robert P. Stein, Stroock & Stroock & Lavan, New York City, Burton

---

Y. Weitzenfeld, Stanley M. Lipnick, Patrick F. Geary, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., on the brief for Whirlpool Corp.; Charles A. Tausche, Chicago, Ill., and Joseph J. Skinner, New York City, on the brief for Sears, Roebuck and Co.), for defendants-appellants.

Malcolm A. Hoffmann, New York City (Edward A. Woolley, Robert W. Biggar, Robert C. Agee, Bernard Zucker and Craig Schiller, New York City, on the brief), for plaintiff-appellee.

Before ANDERSON and MANSFIELD, Circuit Judges, and BRIEANT, District Judge.[*]

ROBERT P. ANDERSON, Circuit Judge:

This is an appeal from a judgment entered on July 13, 1976 in favor of Oreck Corporation (Oreck) against defendants Whirlpool Corporation (Whirlpool) and Sears, Roebuck & Co. (Sears) on two counts of a seven count complaint charging violations of § 1 of the Sherman Act, 15 U.S.C. § 1. Oreck was awarded $2,250,000 (after trebling) in monetary damages. For the reasons set forth below, we reverse.

The factual basis of this controversy is fairly straightforward. Whirlpool is a manufacturer of vacuum cleaners (as well as other household appliances not relevant here) and has been in that business since 1957, when it acquired the Birtman Electric Co. Birtman had previously manufactured vacuum cleaners for Sears, under the Kenmore label. Whirlpool continued this business, and also sought to sell vacuum cleaners under its own "RCA-Whirlpool" label. It discontinued the line of sales under this label for approximately two years after which it re-entered the field through a designated exclusive distributor, Oreck, which was appointed in 1963 for an initial term of five years, with automatic extensions for one year periods thereafter, absent six months prior notice of termination by either party. Whirlpool gave Oreck formal notice of termination of the agreement on June 27, 1968, but instead, a new agreement, dated August 1, 1968, was drawn up extending Oreck's distributorship until December 31, 1971, with no provision for extension. At the expiration of this extension, however, Oreck's relationship with Whirlpool, as its exclusive distributor, was not renewed or extended, and it terminated completely. The instant action followed in September of 1972.

This lawsuit and the underlying controversy, are based on the claimed *reasons* why Oreck was not afforded an additional term as Whirlpool's exclusive distributor of vacuum cleaners. Oreck's successful contention below was that its agreement was not renewed by Whirlpool at the behest and insistence of Sears, a much larger purchaser of Whirlpool vacuum cleaners than Oreck. Sears' association with Whirlpool extended back to 1925, when Sears acquired 750 shares of Whirlpool's forerunner corporation, the Upton Machine Co.[1] By January of 1960, Sears owned approximately 4% of Whirlpool's outstanding stock. Oreck also contended that Sears did not want Oreck to compete with its own line of Kenmore vacuum cleaners, also manufactured by Whirlpool, and that it used its influence with Whirlpool to have Oreck's exclusive distributorship terminated.

Accordingly, Oreck's complaint charged both Whirlpool and Sears with engaging in a contract, combination or conspiracy in unreasonable restraint of trade to exclude Oreck from the vacuum cleaner market in the United States and Canada (counts one and two of the complaint) and with forcing or persuading potential customers of Oreck from refusing to deal with Oreck (count three). Additionally, count four of the complaint charged Whirlpool with selling

---

[*] Of the Southern District of New York, sitting by designation.

1. According to Sears' answer to one of plaintiff's interrogatories, after Sears' purchase of 750 shares of Upton Machine Co. in 1925, "the Upton Machine Company underwent major corporate changes, including merger with the Seeger Refrigeration Company in 1955, and The Birtman Electric Company in 1957. The name of the resulting corporation was changed to Whirlpool Corporation in 1957."

vacuum cleaners, attachments and parts to Sears at unlawfully discriminatory prices, contrary to 15 U.S.C. § 13(a) and count five with Sears' knowing inducement or receipt of those same discriminatory prices, prohibited by 15 U.S.C. § 13(f). Finally, count six alleged irreparable damage to Oreck as a result of Sears' and Whirlpool's violations of the antitrust laws and Oreck's absence of an adequate remedy at law, and count seven pleaded damage to Oreck in the amount of $6,500,000 as a result of Sears' alleged status as a "control person" over Whirlpool (because of Sears' stockholdings in Whirlpool) and the close relationship between the two defendants over a period of 50 years. Counts three, four and seven were voluntarily dismissed on Oreck's motion; and the court directed a verdict for defendants on counts three and four, the alleged Robinson-Patman Act violations.

■ The trial testimony therefore centered on counts one and two, the alleged Sherman Act violations. Plaintiff's case for liability rests largely upon the testimony of Marshall Oreck, its General Manager, and upon the testimony of its President and founder, David Oreck, who told of his relationship with Whirlpool over the years and of his belief, derived primarily from communications with one John Payne, a salesman for Whirlpool, that the reason for the cancellation was Sears' desire to end competition from Oreck. Plaintiff also presented the deposition of Payne, who did not appear at the trial. Hyman B. Ritchin, an economic consultant, and Ernest L. Sommer, a certified public accountant, gave testimony for the plaintiff on the issue of damages.

By way of defense and explanation of Oreck's cancellation, Whirlpool presented the testimony of its officers who dealt with Oreck, showing that the reason for the cancellation was Oreck's failure to follow an assigned marketing strategy. Jack D. Sparks, a Vice President and Director of Whirlpool, who made the decision to terminate Oreck, testified that the exclusive distributor had failed to market Whirlpool vacuum cleaners through "major accounts" (department store chains and the like) and had instead resorted to "commercial-type distribution" (janitorial supply houses and mail order sales), a strategy which did not agree with Whirlpool's desires. Sparks explained that he accepted a subordinate's recommendation to terminate Oreck "because Oreck corporation had failed to reach the original objective when we first conceived the program in 1963 which was to set up a one-step distribution system nationally to major accounts on vacuum cleaners with the hopes that ultimately we would have a system that other specialty-type products could go through." Sparks denied being concerned with competing against Sears, pointing out that "the system we . . . talked about [distribution to "major accounts" such as department stores] would be in direct competition with Sears."[2]

Significantly, however, plaintiff presented *no* evidence or testimony that the net economic effect of Oreck's cancellation was unreasonably to restrain trade in the vacuum cleaner industry in the United States and/or Canada. In fact, as to this critical inquiry, David Oreck testified on direct examination that "[t]he vacuum cleaner industry is, indeed, a very large one" and that during 1971, when Oreck sold 78,203 vacuum cleaners, "the vacuum cleaner industry in 1971 was about 7.8 million purchases." Basic arithmetic reveals, therefore, that Oreck had a 1% market share at the time of the completion of his exclusive distributorship for Whirlpool. Moreover, David Oreck admitted on cross-examination that, following this event, the plaintiff obtained an alternative source of supply and was, at the time of trial, the world's largest supplier of "top fill upright vacuum cleaners."

The above testimony and the other evidence adduced at the trial by the plaintiff show nothing more than the refusal by Whirlpool to renew Oreck's exclusive distributorship of Whirlpool vacuum cleaners

**2.** It is thus difficult to understand the dissent's view that there was "[n]o substantial evidence . . . offered to show that Oreck was terminated for some possible lawful reason. . . ." (Emphasis supplied.)

under the "Whirlpool" label and the replacement of Oreck, in effect, by Sears, the other existing distributor, who sold the same manufacturer's vacuum cleaner but under the label, "Kenmore." It is well-settled that

"[w]hen an exclusive dealership 'is not part and parcel of a scheme to monopolize and effective competition exists at both the seller and buyer levels, the arrangement has invariably been upheld as a reasonable restraint of trade. In short, the rule was virtually one of *per se* legality' until the District Court decided the present case [which was reversed]." (Cases cited in footnote omitted.) *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 163, 243 F.2d 418, 420, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).[3]

The Supreme Court expressed much the same rationale in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *overruled on other grounds, Continental T.V., Inc. v. GTE Sylvania Inc.*, ─── U.S. ───, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), where it held that a manufacturer may choose his own customers and franchise certain exclusive dealers:

"If the restraint stops at that point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act." 388 U.S. at 376, 87 S.Ct. at 1864.

*See also, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) ("it is well settled that it is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means cutting off another distributor [citing cases].");[4] *Bay City-Abrahams Bros. Inc. v. Estee Lauder Inc.*, 375 F.Supp. 1206, 1214–16 (S.D.N.Y.1974); *Top-All Varieties, Inc. v. Hallmark Cards, Inc.*, 301 F.Supp. 703, 704–5 (S.D.N.Y.1969).

Under these standards, given additional weight by the Supreme Court's recent over-

---

**3.** The holdings of *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), and a similar case, *Schwing Motor Co. v. Hudson Sales Corp.*, 138 F.Supp. 899 (D.Md.), *aff'd*, 239 F.2d 176 (4th Cir. 1956), *cert. denied*, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957), were succinctly summarized in a case relied on by the dissent, *Quality Mercury Inc. v. Ford Motor Co.*, 542 F.2d 466 (8th Cir. 1976), as follows: "Both courts [*Packard* and *Schwing*] held that a manufacturer has a right to select his customers and may agree with one to exclude another, if: (1) the agreement is not a horizontal one between competitors; (2) the manufacturer is not using it to establish market dominance; or (3) the manufacturer is not using it to promote a monopoly." 542 F.2d at 470. As is made clear in the remainder of this opinion, Whirlpool, as the manufacturer of vacuum cleaners, did not engage in a horizontal agreement between competitors, while Oreck submitted no substantial proof that Whirlpool's motive in cancelling Oreck was to establish market dominance or to promote a monopoly in the vacuum cleaner business.

The dissent also relies on *Quality Mercury, supra,* for the proposition that a *per se* rule under § 1 of the Sherman Act becomes applicable when "a horizontal, intrabrand competitor exercises a veto power over plaintiff's access to the manufacturer's goods or trademark . . . ." The result in *Quality Mercury,* however, involving the refusal of Ford to grant a Lincoln dealership in the Minneapolis area allegedly because a preexisting dealership had veto power over such a decision, was to remand for trial in order to allow the plaintiff "an opportunity to prove the unreasonableness of the restraint," 542 F.2d at 472, decidedly *not* a *per se* approach to the alleged Sherman Act violation.

**4.** *United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973), cited in the dissent as limiting the *Hawaiian Oke* holding, was a case where hotels, restaurants and companies supplying those businesses in Portland, Oregon, organized an association to attract conventions to their city. The association was financed by contributions from its members. "To aid collection, *hotel members . . . agreed* to give preferential treatment to suppliers who paid their assessments, and to curtail purchases from those who did not." 467 F.2d at 1002. (Emphasis supplied.) *Hilton Hotels* thus involved a horizontal agreement between competitors at the same level, not the situation in *Hawaiian Oke* or the present case.

ruling of the *per se* approach to vertical location restrictions of *United States v. Arnold, Schwinn & Co., supra,* in *Continental T.V., Inc. v. GTE Sylvania Inc., supra,* Oreck was required to show not only conspiratorial conduct by Sears and Whirlpool in order to recover under § 1 of the Sherman Act, but also credible proof that the net result and effect of the allegedly conspiratorial conduct of the defendants was anticompetitive in the vacuum cleaner industry as a whole or that the conspiracy was designed to drive Oreck out of the vacuum cleaner business.

■ In instructing the jury, the trial court quoted the language of § 1 of the Sherman Act and then further defined the meaning of the terms within that statute as follows:

"As to the meaning of the term 'restraint of trade,' you are instructed that this general term applies only to unreasonable restraints and not to all possible restraints of trade. Not all restraints of trade are reasonable. All business affects trade in some way.

*The violations alleged by plaintiff are,* if you credit them, *unreasonable restraints of trade.* If you do not credit them, Whirlpool's conduct was not an unreasonable restraint of trade." (Emphasis supplied.)

The trial court further instructed the jury with regard to count one that "[i]f you find there was such an agreement [between Whirlpool & Sears 'to exclude Oreck from a market in vacuum cleaners or Whirlpool vacuum cleaners anywhere'], then you should go on to consider damages, if any, flowing from it." An almost identical charge was given as regards count two, dealing with Oreck's alleged exclusion from the Canadian market. We hold that the above-quoted portions of the jury instructions constitute plain error which make nec-

essary a reversal of this judgment. Under these instructions, the jury could have gone no further than to find a conspiracy followed by an assessment of damages.

Oreck's argument that it *did* show an unreasonable restraint of trade because the net effect of its termination was to provide Sears with a "monopoly position" in the market for Whirlpool vacuum cleaners is plainly unpersuasive. Oreck did not demonstrate anything unique about Whirlpool vacuum cleaners sufficient to establish them as a separate market apart from all other brands, *United States v. E. I. DuPont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 550–52 (1st Cir. 1974). Oreck's further attempt to characterize its cancellation as a "group boycott" under the rule of *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), which treats such behavior as a *per se* violation of § 1 of the Sherman Act, is similarly incorrect. In *Klor's,* the Supreme Court specifically noted that "[t]his is not a case of . . . a manufacturer and a dealer agreeing to an exclusive distributorship," 359 U.S. at 212, 79 S.Ct. at 709–10. The present case *is,* in essence, a case involving an exclusive distributorship controversy, and the "group boycott" doctrine is, therefore, not applicable. Had Sears joined with other retailers of Whirlpool vacuum cleaners to drive Oreck out of the vacuum cleaner market, this court would have been presented with a totally different situation, but Sears did not do so, and, therefore, *Klor's* is not applicable. Because Sears is a large company presumably selling a large number of vacuum cleaners does not, *ipso facto,* convert this case into a horizontal conspiracy warranting *per se* treatment.[5]

---

5. The dissent attempts to get around these facts by claiming that "Sears was the equivalent of many Whirlpool vacuum cleaner distributors," a novel theory which simply transforms Sears into something it is not. The implications of applying such a concept in future cases

require the trial court to make legislative determinations. When is a single company "big" enough to be considered tantamount to a series of "little" companies? The dissent presumably leaves the determination of what is a "big" company for this purpose of one case but not

Any effect on price competition for the sale of Whirlpool vacuum cleaners, brought about by the cancellation of Oreck's exclusive distributorship, cannot have any legal or economic significance in the present case. Economically, the view that the net effect of Oreck's cancellation will be to raise the price of Whirlpool vacuums has no significance absent a showing that consumers cannot substitute for Whirlpool another type of vacuum cleaner that is as effective and equally attractive as Oreck's was in price. In addition, Oreck has neither charged nor proven a conspiracy to fix prices for Whirlpool vacuum cleaners. Nowhere in the complaint does Oreck allege that Whirlpool's refusal to deal was aimed at eliminating intrabrand price competition. The inappropriateness of any claim of price-fixing is made even more clear by the fact that Sears markets its vacuum cleaners under the "Kenmore" label. Oreck's exclusive distributorship of vacuum cleaners under the "Whirlpool" label would not, from the point of view of the public consumer, have any particular effect on competition with machines sold by Sears.

Indeed, to rule otherwise would place intolerable restraints on the ability of a manufacturer to award and cancel an exclusive distributorship where no public harm has been shown. Whirlpool would be thereby compelled to continue Oreck's exclusive distributorship indefinitely, despite the manufacturer's clear intent and desire not to renew it and in derogation of its express contractual right and power not to renew it.

Blindly protecting Oreck without regard to the cancellation's effects on the affected market thus disregards the well-established rule that "[t]he antitrust laws . . . were enacted for 'the protection of *competition,* not *competitors* . . ..'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original).

The judgment of the district court, based as it is on a finding of liability on the part of the defendants, is reversed and the case is remanded for a new trial. In doing so, we express no opinion as to the correctness of those portions of the trial court's jury instruction dealing with the formulation of damages.

MANSFIELD, Circuit Judge (dissenting):

With due respect, I must dissent. This case is governed by well-settled antitrust law principles governing combinations and conspiracies designed to restrain competition on the part of of a specific competitor—in this case Oreck—which the majority chooses to disregard.

The evidence, viewed most favorably to plaintiff-appellee Oreck, as it must be after the jury's verdict, *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), reveals a classic *per se* restraint of competition of the type condemned by the Supreme Court in *United States v. General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Whirlpool, a large manufacturer of appliances,

---

"big" for the purpose of another case, to the wisdom of the trial judge, in the complete absence of any criteria or standards which the court can apply.

The dissent also charges the majority with looking not to substance but to form. Perhaps the best rejoinder to such a characterization of our opinion is contained in Judge Medina's fine opinion in *United States v. Morgan,* 118 F.Supp. 621 (D.C.1953), an action under §§ 1, and 2 of the Sherman Act against seventeen investment banking firms charging a combination, conspiracy and agreement to restrain and monopolize the securities business in the United States, in which the court wrote:

"Much of the confusion, especially in the field of antitrust law, is due to the fact that the breadth and scope of the Sherman Act

are so general and beneficent that lawyers and even judges often fail to heed repeated admonitions that each case must necessarily stand on its own legs, and that the conclusions reached in each case depend largely upon the peculiar characteristics of the particular industry involved." 118 F.Supp. at 688.

In short, the facts and circumstances of this controversy do not call for the application of the *per se* rule against price fixing and/or group boycotts, so that the *per se* approach must not be dogmatically followed because it was used in other cases in which those factors were present. Indeed, the dissent's attempt to convert this case into one involving a horizontal price fixing conspiracy itself might be characterized as looking to form rather than substance.

including vacuum cleaners, combined with Sears, Roebuck, a merchandising giant which for 40 odd years had distributed the lion's share of Whirlpool's entire output, to stop plaintiff-appellee Oreck, the only other distributor of Whirlpool vacuum cleaners, from competing against Sears in the sale of Whirlpool-made machines. The motive was clear—to prevent Oreck's price-cutting and other competitive practices from interfering with Sears' higher prices and its sales of Whirlpool-made vacuum cleaners. When Oreck refused to knuckle under as requested, the combination agreed to have Whirlpool cut it off as a distributor of Whirlpool machines, which was done even though Oreck had dramatically increased its sales of Whirlpool vacuum cleaners from 8,384 units to 78,203 units over the preceding four years. As a result, the public lost the benefit of Oreck's competition and particularly of its lower prices in the sale of Whirlpool vacuum cleaners. Thereafter, if customers wanted Whirlpool machines they would have to buy them from Sears and pay Sears' higher prices. The principles governing such a case were summarized by the Supreme Court in *United States v. General Motors*, 384 U.S. at 146–47, 86 S.Ct. at 1331 (1966) as follows:

> "The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. See Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 872–885 (1955). Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed—as in *Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n, supra* [312 U.S. 457] at 468 [61 S.Ct. 703, 85 L.Ed. 949].

We note, moreover, that inherent in the success of the combination in this case was a substantial restraint upon price competition—a goal unlawful *per se* when sought to be effected by combination or conspiracy. *E. g., United States v. Parke, Davis & Co.*, 362 U.S. 29, 47 [80 S.Ct. 503, 513, 4 L.Ed.2d 505]; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 [60 S.Ct. 811, 844, 84 L.Ed. 1129]. And the per se rule applies even when the effect upon prices is indirect. *Simpson v. Union Oil Co.*, 377 U.S. 13, 16–22 [84 S.Ct. 1051, 1057, 12 L.Ed.2d 98]; *Socony-Vacuum Oil Co., supra.*"

The background of the conspiracy is instructive. Since 1925 Sears has been the principal distributor of Whirlpool products, currently purchasing more than two-thirds of Whirlpool's total appliance production and, at the time of the events here involved, more than 90% of Whirlpool's vacuum cleaner output for resale under Sears' "Kenmore" label. In addition Sears, beginning in 1925, purchased a substantial block of Whirlpool's common stock and by 1960 became its largest single shareholder, owning 251,192 shares and usually electing one or more of its executives to Whirlpool's board of directors. Sears, therefore, has been in a position to exercise considerable leverage power over Whirlpool's sales and distribution policies and decisions.

Prior to the formation of Oreck in 1963, Whirlpool had periodically attempted to broaden the sales if its vacuum cleaners by marketing them under its own brand name, but had found that its existing distribution network was inadequate and that Sears' sales of Whirlpool-manufactured vacuum cleaners at higher retail prices posed a barrier to Whirlpool's entry into price competition against other brands as long as it was restrained by its arrangement with Sears from competing price-wide against Sears in the sale of Whirlpool-made machines. As a result Whirlpool in 1961 discontinued efforts to sell its product independently under its own name and H. Thomas Stroop, a Whirlpool executive, prepared a report enti-

tled "Appraisal of Vacuum Cleaner Business—RCA Whirlpool". He concluded that "Unlike other appliances, Sears sells their [vacuum] cleaners for as high or higher prices than major brand competition. . . .

"Sears becomes very unhappy if RCA WHIRLPOOL product [sic] is retailed for less than the Sears product manufactured by Whirlpool. For this reason, we understand that it has been decided that the RCA WHIRLPOOL brand should have retail prices comparable to Sears.

"Our challenge then . . . 'Can we sell cleaners in volume at high retail prices . . . and if so how?'" (Pl. Ex. 160)

Thereafter, until the events giving rise to this case, Whirlpool-made vacuum cleaners were sold to the public only by Sears.

In April, 1963, Whirlpool's interest in selling its vacuum cleaners under its own brand name was revived. Jack Sparks, Vice President of Whirlpool, approached David Oreck, who had prior to 1961 been in charge of Whirlpool vacuum cleaners sales for Bruno, New York and had been the most successful distributor of Whirlpool vacuum cleaners under its own brand name before Whirlpool discontinued such sales. The result was an agreement to the effect that the newly-formed Oreck Corporation, plaintiff-appellee, would function as the exclusive United States distributor of Whirlpool brand vacuum cleaners. Sparks advised Oreck that he was "not to conflict with Sears, Roebuck on price" and that an internal Whirlpool letter confirmed that Oreck's prices would "emphasize specialty [i. e., high-priced] selling".

Oreck soon found that it could not compete with Sears in selling Whirlpool-made vacuum cleaners at Sears' prices and decided that it could distribute them profitably only by selling at lower prices and through direct mail or institutional supply houses, which would, by reducing or eliminating the middleman's mark-up, enable Oreck to sell competitively and profitably at the lower price levels. Accordingly, in 1967 Oreck began a large-scale mail solicitation campaign which, dramatically increased its sales of Whirlpool machines from a low in 1967 of 8,384 units to an all-time high of 78,203 units in 1971, the year Whirlpool terminated its distributorship. The mail order campaign offered the vacuum cleaners to carefully selected groups of consumers at very low prices. Oreck planned to realize its profit from the sale of dust bags and accessories over the 10–15 year life of the product. Despite the prospects for increased sales, three Whirlpool executives, Jack Sparks, Sol Sweet and John Payne, Whirlpool's primary contact with Oreck, all expressed disapproval of the mail order campaign, Payne advising Oreck that Whirlpool's unhappiness was attributable to the company's "other customer" (Sears), which did not like the mail solicitation. Payne also told Oreck that the "other customer got to the head of the company [Whirlpool]".[1]

That a Whirlpool-Sears combination had been formed to stop Oreck's competition against Sears is further evidenced by events during the preceding year, 1966, when David Oreck sought to obtain Whirlpool's approval of Oreck's plan to market in Canada, where Sears operated under the name of Simpson-Sears Ltd. Whirlpool refused to make the minor changes in the vacuum cleaner necessary to conform to Canadian Standards Association requirements, as they had done for Sears, and Payne later wired Oreck that it could not market in Canada because Whirlpool could not "obtain a waiver to the current franchise," meaning approval by Sears. A concurrent Whirlpool internal memorandum criticized Oreck's emphasis on low-priced sales, concluding that, "Needless to say, we should not con-

---

1. Payne's statements were never objected to by defendants as not within the scope of his employment by Whirlpool and are therefore admissible under Rule 801(d) of the Federal Rules of Evidence. Judge Owen also instructed the jury, without objection by defendants, that defendants' failure to call Payne to the stand to explain or refute these statements, given his clear availability, may be taken to indicate that if called his testimony would have been unfavorable to defendants.

sider for a moment authorizing Oreck to operate in Canada."

By 1968 the Whirlpool-Sears combination was continuing to put the screws on Oreck in an effort to force it to adhere to Sears' prices, sales methods, and markets. In that year Whirlpool refused to manufacture private label vacuum cleaners for certain of Oreck's large customers, and Payne attributed the refusal to "objections from our other customer. . . ." In 1969 and 1970, Whirlpool refused to make minor changes in Oreck's shipping carton to meet parcel post requirements and thereby avoid a penalty charge, even though Whirlpool had provided Sears with an acceptable box for its mail orders. Payne, who handled the matter, attributed the refusal not to engineering difficulties but to a "corporate" decision.

On December 31, 1971, despite Oreck's highest sales level since it had begun selling Whirlpool vacuum cleaners, Whirlpool terminated the Oreck distributorship.

The foregoing, together with other evidence and witnesses viewed by the jury, supported the jury's inference that Whirlpool terminated Oreck as the result of the combined efforts of Sears and Whirlpool to put an end to Oreck's competition against Sears in the sale of Whirlpool machines, including mail-order solicitation and low prices, to which Sears objected because of the possible adverse effect on its sale of Whirlpool vacuum cleaners under its own label at higher prices and without any Canadian Whirlpool competition. No substantial evidence was offered to show that Oreck was terminated for some possibly lawful reason, such as failure to increase Whirlpool sales or Whirlpool's desire to protect its trade name, other than testimony of Jack D. Sparks and John Payne that Oreck had failed to market to "major accounts," which was understandably rejected by the jury in view of Oreck's tremendous increase in sale of Whirlpool cleaners from 1967 to 1971.

The law governing the case is clear and well-settled. A manufacturer may *unilaterally* choose his customers, *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and *unilaterally* substitute one exclusive distributor for another, *Alpha Distributing Co. v. Jack Daniels Distillery*, 454 F.2d 442, 452 (9th Cir. 1972). However, it is elementary that a combination between a manufacturer and one or more of its customers which has as its sole object the restraint of another customer's competition through purchase and resale of the manufacturer's product is *per se* illegal. *United States v. General Motors*, 384 U.S. 127, 146–47, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Parke-Davis & Co.*, 362 U.S. 29, 47, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178, 186–7 (5th Cir. 1972), cert. den., 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); Barber, *Refusals to Deal Under The Federal Antitrust Laws*, 103 U.Pa.L.Rev. 847, 875 (1955).

In *United States v. General Motors, supra,* the manufacturer and a group of its Los Angeles area dealers agreed to discontinue selling Chevrolets through discount houses advertising discount prices and lower financing costs. The Court characterized the arrangement as a "classic conspiracy in restraint of trade," explaining the application of the *per se* rule as follows:

> "[I]nherent in the success of the combination . . . was a substantial restraint upon price competition—a goal illegal per se when sought to be effected by combination and conspiracy. . . . And the *per se* rule applies even when the effect upon prices is indirect." 384 U.S. at 147, 86 S.Ct. at 1331.

*General Motors* represented one more application of the basic principle established long ago in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223–24, 60 S.Ct. 811, 844–45, 84 L.Ed. 1129 (1940) to the effect that

> "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce

is illegal *per se.* . . . Where the means for price-fixing are purchases or sales of the commodity in a market operation or, as here, purchases of a part of the supply of the commodity for the purpose of keeping it from having a depressive effect on the markets, such power may be found to exist though the combination does not control a substantial part of the commodity. . . . Price-fixing agreements may have utility to members of the group though the power possessed or exerted falls far short of domination and control. Monopoly power (*United States v. Patten,* 226 U.S. 525 [33 S.Ct. 141, 57 L.Ed. 333]) is not the only power which the Act strikes down, as we have said. Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act."

Moreover, such a combination by agreement to restrain price competition or through refusal to deal with a customer is *per se* illegal whether it is horizontal, vertical or embraces participants from both levels. See, e. g., *United States v. Arnold, Schwinn & Co.,* 388 U.S. at 375–76, 87 S.Ct. 1856, where the Supreme Court observed that a conspiracy embracing both levels is illegal *per se,* when it is "ancillary to price fixing" or "price fixing is 'an integral part of the whole distribution system'," 388 U.S. at 375, 87 S.Ct. at 1864, even if the effect on prices is "indirect," *United States v. General Motors, supra,* 384 U.S. at 147, 86 S.Ct. 1321.

The majority further errs in stating that Oreck's complaint fails to allege that "Whirlpool's refusal to deal was aimed at eliminating intrabrand price competition." The complaint alleges clearly an agreement between Sears and Whirlpool to restrain Oreck's competition against Sears in the sale and distribution of Whirlpool-made vacuum cleaners. Plaintiff Oreck alleged, at ¶¶ 14–15 of the First Claim of its complaint, that when Oreck began "to compete seriously with Sears" in the sale and distribution of Whirlpool products—specifically "sales of 'Kenmore' vacuum cleaners" made by Whirlpool—Whirlpool terminated its distributorship to "eliminate any serious competition to Sears, Roebuck from Oreck." These allegations were clearly broad enough to embrace restraint of price competition by Oreck against Sears in the sale of Whirlpool-made vacuum cleaners, an issue that was actually tried without objection. Par. 21 of the complaint, moreover, alleges that improvements in Whirlpool's vacuum cleaner were withheld "with the intent and effect of . . . reducing Oreck's competition with Sears, Roebuck." Although the complaint also alleged that the purpose and effect of the combination was to exclude Oreck generally from the vacuum cleaner market—a type of allegation not unusual in civil antitrust cases—the record, including the examinations of witnesses, summations of counsel and the court's instructions, show that the case was tried and submitted to the jury on the claim that Whirlpool and Sears combined to restrain Oreck from competing against Sears, particularly on prices, in the sale of Whirlpool-made machines, as a result of which Oreck was ultimately cut off as a distributor of such machines. At trial and prior to the jury's verdict, the court and counsel had no disagreement as to the applicable legal principles, as the following colloquy with respect to the Court's proposed charge shows:

"The Court: I understand that, but it seems to me that if the jury were to conclude that Sears and Whirlpool had conspired to terminate Oreck to rid Sears of a competitor, they have gone all the farther that they need to go.

"Mr. Turoff [Whirlpool's counsel]: I see now your Honor's argument. I think what you are saying is that if the jury finds that we had a conspiracy for the purpose of getting rid of Oreck, that is an unreasonable restraint of trade. That is, I think, a correct statement of the law."

Thus the evidence presented at trial to the effect that the termination culminated a Sears-Whirlpool conspiracy to eliminate Oreck's competition against Sears, and par-

ticularly its price competition, established a *per se* violation of § 1 of the Sherman Act.[2]

Since a refusal to deal for the purpose of eliminating intrabrand price competition is thus *per se* unlawful, the majority errs in holding that plaintiff Oreck was required also to prove a restraint of trade in the .elevant market. In *General Motors*, where the Supreme Court found *per se* unlawful a similar combination to restrain intrabrand price competition by refusing to deal with "discounters" of Chevrolet cars, the Court deemed it unnecessary to consider the effect of the intrabrand competition on the relevant market or the availability of alternative sources of supply to the discounters. Indeed, as early as *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), the court condemned the boycott of price cutters, without regard to the availability of alternative products. *See also Ford Motor Co. v. Webster's Auto Sales Inc.*, 361 F.2d 874 (1st Cir. 1966) (*per se* rule applied without regard to alternative sources of supply available to plaintiff).

The dealer-termination cases relied upon by the majority, see, e. g., *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1972), *Alpha Distributing Co. v. Jack Daniels Distillery*, 454 F.2d 442, 452 (9th Cir. 1972), and *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), are all clearly distinguishable and do not govern the facts of this case. They stand simply for the proposition that a manufacturer may unilaterally terminate or replace an exclusive distributor for legitimate business purposes without violating § 1 of the Sherman Act. The critical distinction is that in the cases relied upon by appellants, unlike the present case or *General Motors*, there was no evidence that the cutoff or substitution was pursuant to a combination to restrain competition by the victim against the conspirators in the sale of the product. Indeed, each of the dealer termination cases finding no violation of § 1, including the carefully reasoned opinion in *Hawaiian Oke*, recognize that a *per se* rule would apply to a dealer termination where the manufacturer had the "anticompetitive objective" of excluding "one or more so-called 'discounters' or 'price cutters'". 416 F.2d at 76. In *Hawaiian Oke* no such evidence of anticompetitive reason or effect was offered by the plaintiffs and the Court of Appeals understandably found reversible error in the district court's instruction that a *per se* violation is made out by any agreement which "is bound to reduce another businessman's opportunity to compete in the same market." 416 F.2d at 75. However, the court was careful to distinguish the case from those, like the present case, where an objective was to restrain competition, stating:

> "In other cases, there was concerted action by one group to put one or more of their competitors out of business, or to impair their ability to compete with the

---

2. The proof of a conspiracy between Whirlpool and Sears was more than sufficient. Indeed, a manufacturer may be held to violate § 1 of the Sherman Act "irrespective of monopoly or conspiracy," when he refuses to deal with a distributor and thereby creates an "arrangement" in restraint of trade. *Osborn v. Sinclair Refining Co.*, 324 F.2d 566, 573 (4th Cir. 1963). The existence of a conspiracy and Sears' membership and participation could also be inferred from the totality of the course of conduct engaged in by the defendants, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920). The jury was entitled to rely, among other things, upon (1) Sears' purchase of 90 per cent of Whirlpool's annual production of vacuum cleaners and two-thirds of its production of all appliances, (2) Sears' position on the Whirlpool board, (3) its use of its own brand name (which decreased its reliance on Whirlpool as a source) and (4) Sears' traditional high price structure. This evidence of a motive to maintain high prices and leverage over Whirlpool coincided with Whirlpool's irrational termination of an increasingly successful distributor, Oreck's entry into Sears' mail order domain at discount prices, the fact that "an honorary director of Sears" placed Oreck's mail order solicitation before the Whirlpool board, and Payne's statements to David Oreck admitting that Sears had applied pressure on Whirlpool. Viewed as a whole the evidence clearly supported the jury's finding of conspiracy.

conspirators. *See Silver v. New York Stock Exchange,* 1963, 373 U.S. 341, 347, 83 S.Ct. 1246, 10 L.Ed.2d 389; *Radiant Burners v. Peoples Gas Light & Coke Co.,* 1960, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; *Associated Press v. United States, supra* [326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013]. . . . In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, there was an agreement between sellers to refuse to sell to wholesalers who would not agree to abide by maximum resale prices fixed by the sellers. Thus the boycott of the plaintiff to that case was part of a price-fixing scheme. . . .

"Here, plaintiff presented no evidence whatever that either Seagram or Barton had any *anticompetitive* motive for terminating plaintiff as their distributor. There were no price fixing or other similar motives or demands or activities." *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d at 77–78.

The limitations of the *Hawaiian Oke* decision were further made clear by the Ninth Circuit in *United States v. Hilton Hotels Corp.,* 467 F.2d 1000, 1003 (9th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973), where the court held that a refusal to deal in order to coerce competitors or to exclude them from competition (which is the case here) is illegal *per se. Hawaiian Oke* was distinguished as a case in which the manufacturer's "primary purpose" and "direct effect" was to achieve a "legitimate business objective."[3] A similar line of cases has held that, although a manufacturer may unilaterally terminate a distributor or for his own legitimate business reasons refuse to grant an exclusive distributorship, when a horizontal,

intrabrand competitor exercises a veto power over plaintiff's access to the manufacturer's goods or trademark, as Sears did here, an inference of anticompetitive motive and effect is available and the *per se* rule becomes applicable. *Quality Mercury Inc. v. Ford Motor Co.,* 542 F.2d 466, 470 (8th Cir. 1976); *American Motor Inns v. Holiday Inns, Inc.,* 521 F.2d 1230, 1242 (3rd Cir. 1975).

*Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), relied upon by the majority, is the typical dealer termination case in which evidence was presented to show that the survival of Packard's largest area franchise depended, in the business judgment of the company, upon its being given an exclusive franchise. No evidence was presented, as in *General Motors* and the present case, to show that the dealer was terminated because he was a price cutter or in order to maintain high intrabrand prices.

Similarly, the Supreme Court's recent decision in *Continental T.V., Inc. v. GTE Sylvania Inc.,* —— U.S. ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), relied on by the majority, has no application to this case. Although the Court overruled a portion of *United States v. Arnold Schwinn & Co.,* not involved here, it did not change any of the foregoing principles regarding price restraints. On the contrary, it reaffirmed them, restricting its application of the "rule of reason" to exclude vertically-imposed price restraints, —— U.S. ——, 97 S.Ct. 2549 n.18, and *General Motors* -type conspiracies, —— U.S. ——, 97 S.Ct. 2549 n.28.

The majority vainly seeks to get around *General Motors* and other Supreme Court decisions holding similar combinations to

---

**3.** *See also Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972) (*per se* rule applies to refusals to deal to eliminate price cutters); *Bay-City Abrahams Bros. Inc. v. Estee Lauder Inc.,* 375 F.Supp. 1206, 1216 (S.D.N.Y.1974) (refusal to deal is *per se* illegal if the result is price fixing or the elimination of competition); *Ace Beer Distributors Inc. v. Kohn, Inc.,* 318 F.2d 283, 286 (6th Cir.), *cert. den.,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963) (same); *E. A.*

*McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.,* 467 F.2d 178, 186–7 (5th Cir. 1972), *cert. den.,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973) (combinations among traders at different marketing levels to exclude a competitor of some member of the combination is illegal *per se* ); Barber, *Refusals to Deal Under the Federal Antitrust Laws,* 103 U.Pa.L. Rev. 847, 875 (1955).

restrain competition illegal *per se* by pointing to the fact that more than one competing dealer was involved in the *General Motors* conspiracy and by suggesting that, if Sears had joined with another distributor rather than with Whirlpool to restrain Oreck's price competition, perhaps *General Motors* might apply. The attempted distinction has no legal significance and ignores the substantive fact that Sears was not only the sole other distributor of Whirlpool machines but handled some 90% of the vacuum cleaners made by Whirlpool. Sears was the equivalent of many Whirlpool vacuum cleaner distributors. The effect of its combining with Whirlpool to stop Oreck's price competition was just as harmful to Oreck and to the public as would be a combination between two small distributors to eliminate a discounter, which under the majority's distinction would be *per se* illegal under *General Motors*. A combination to restrain intrabrand price competition cannot be condoned simply because it consists solely of the manufacturer of the product and its only distributor, a huge merchandising chain, without participation by a second distributor. The law looks to substance, not form, and condemns as *per se* illegal any combination or conspiracy of 2 or more persons to restrain price competition or to eliminate a competitor.

For the foregoing reasons I would affirm the judgment of the district court.[4] The majority has in my view seriously erred in its concept of the antitrust principles that govern this case. The decision departs from basic principles established in numerous decisions of the Supreme Court. It will have mischievous results, since it will be seized upon by those who would otherwise be bound by established precedent to demand similar treatment. It weakens the

---

**4.** I would also find that Oreck's proof of damages was sufficient to meet its burden of proof and to support the jury's verdict since "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," *Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), and that in the absence of precise damage calculations "the wrongdoer should bear the risk

private enforcement of the antitrust laws, upon which the Executive Branch heavily depends. I therefore dissent.

of uncertainty that his own conduct has created." *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 565 (2d Cir. 1970). Here plaintiff's evidence of profit structure and sales performance over the years prior to termination .and its projections by an expert witness as to future performance, clearly afforded the jury "a reasonable basis of computation." *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1929).