ORECK CORPORATION,
Plaintiff-Appellee,

v.

WHIRLPOOL CORPORATION and
Sears, Roebuck & Co.,
Defendants-Appellants.

No. 1173, Docket 76–7631.

United States Court of Appeals,
Second Circuit.

Submitted Feb. 16, 1978.

Decided May 1, 1978.

Law Firm of Malcolm A. Hoffmann, New York City, Malcolm A. Hoffmann, Edward A. Woolley, Robert W. Biggar, Jr., Robert C. Agee, Bernard Zucker, and Craig Schiller, New York City, on brief on rehearing en banc, for plaintiff-appellee.

Alvin K. Hellerstein, Robert P. Stein, and Stroock & Stroock & Lavan, New York City, Burton Y. Weitzenfeld, Michael R. Turoff, Stanley M. Lipnick, Patrick F. Geary, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., on joint brief on rehearing en banc, for defendant-appellant, Whirlpool Corporation.

Charles A. Tausche, Chicago, Ill., and Joseph J. Skinner, New York City, on joint brief on rehearing en banc, for defendant-appellant, Sears, Roebuck & Co.

Before ANDERSON, FEINBERG, MANSFIELD, MULLIGAN, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.*

## ON REHEARING EN BANC

ROBERT P. ANDERSON, Circuit Judge:

The appellants, Whirlpool Corporation (Whirlpool) and Sears, Roebuck & Co. (Sears), appealed from a judgment entered on July 13, 1976, on a jury verdict against them and in favor of Oreck Corporation (Oreck), on two counts of a seven count complaint charging violations of § 1 of the Sherman Act, 15 U.S.C. § 1. On appeal, a divided panel of this court reversed and remanded the case for a new trial. *Oreck Corp. v. Whirlpool Corp.*, 563 F.2d 54 (2d

* Chief Judge Kaufman and Judge Oakes took no part in the *en banc* consideration of this appeal.

Cir. 1977). Appellee's petition for a rehearing en banc was granted on December 15, 1977. The hearing of the appeal en banc was submitted on briefs by all of the parties and without further oral argument. On reconsideration we concur in the judgment of the panel majority, reverse the judgment of the district court, and remand the case for a new trial.

The material facts of this dispute have been set forth in the opinion of the panel majority and will be reviewed here only briefly. Whirlpool has been in the vacuum cleaner business since 1957 when it acquired the Birtman Electric Co. and began manufacturing vacuum cleaners for Sears, to be sold under the "Kenmore" label. Whirlpool also sought to sell vacuum cleaners under its own tradename. In August, 1963, Whirlpool entered into an agreement with Oreck, by which the latter was appointed the exclusive distributor of vacuum cleaners under the name of "Whirlpool" for an initial term of five years, with automatic extensions for one-year periods thereafter, absent six months prior notice of termination of the agreement by either party. Whirlpool gave Oreck formal notice of termination of the agreement on June 27, 1968; but after further negotiations, Whirlpool and Oreck entered into a substituted contract, dated August 1, 1968, which extended Oreck's distributorship through December 31, 1971; it did not, however, contain any provision for an extension. On May 14, 1971, Whirlpool informed Oreck that it intended to allow the sales agreement to expire according to its terms and, on December 31, 1971, Oreck's exclusive distributorship of "Whirlpool" products ended. The instant action followed in September of 1972.

This lawsuit is based on Oreck's claim that it was not afforded the opportunity for an additional period of time as Whirlpool's exclusive distributor at the behest and insistence of Sears, a much larger purchaser of Whirlpool products. Accordingly, Oreck's complaint charged both Whirlpool and Sears with engaging in a contract, combination, or conspiracy in unreasonable restraint of trade to exclude Oreck from the vacuum cleaner market in the United States and Canada.[1]

At trial, Oreck's case for liability rested principally upon the testimony of Marshall Oreck, its General Manager, and of David Oreck, its President. It was their contention that the reason for Whirlpool's failure to renew the contract was Sears' desire to end competition from Oreck. By way of defense and explanation of its action, Whirlpool presented the testimony of its officers who dealt with Oreck to show that, among other reasons, the contract was not renewed after December, 1971, because of Oreck's failure to follow the original marketing strategy contemplated by Whirlpool.[2]

Oreck presented no evidence that the net economic effect of the non-renewal of its contract was to restrain trade unreasonably in the vacuum cleaner industry in the United States and/or Canada.[3] Nor did it show

1. At no time in the course of this litigation has Oreck alleged that either its 1963 or its 1968 contract with Whirlpool in and of itself violated § 1 of the Sherman Act. Neither was alleged to be an agreement which attempted to fix prices or eliminate resale price competition, nor did it attempt to impose unreasonable geographical or customer restraints on Oreck's ability to compete.

2. According to their testimony, it was Whirlpool's intention that Oreck's distributorship would serve as an avenue to the sale of "Whirlpool" vacuum cleaners to department stores and other special retail accounts. There was further testimony that by 1965, Oreck had abandoned this marketing strategy and had resorted to sales to janitorial supply houses, and that Oreck further departed from Whirlpool's original plan by adopting, in 1967, a technique for making sales of "Whirlpool" machines through direct mail orders. It was undisputed that by 1970, mail order sales comprised over 90% of Oreck's business.

3. David Oreck testified that the vacuum cleaner industry is a large one and that during 1971, when Oreck sold 78,203 vacuum cleaners, consumers purchased about 7.8 million cleaners. Oreck, therefore, had no more than a 1% market share at the time of the completion of its exclusive distributorship for Whirlpool. Moreover, there was, at all relevant times, an abundance of vacuum cleaners available in the marketplace which were reasonably interchangeable with those manufactured by Whirlpool.

that alternative sources of supply were unavailable and that it was, therefore, excluded from competition in the vacuum cleaner business. David Oreck admitted that Oreck had been able to obtain vacuum cleaners from another manufacturer and was, at the time of trial, the world's largest supplier of "top fill upright vacuum cleaners."

Despite the lack of mention or reference to any evidence of an anticompetitive purpose or effect in connection with the alleged Whirlpool/Sears agreement, the trial court instructed the jury that,

"The violations alleged by plaintiff are, if you credit them, unreasonable restraints of trade . . . If you find there was

such an agreement [between Whirlpool and Sears "to exclude Oreck from a market in vacuum cleaners *or Whirlpool vacuum cleaners anywhere*"], then you should go on to consider damages." (Emphasis added.)

An almost identical charge was given with respect to count two, dealing with Oreck's alleged exclusion from the Canadian market.[4] Under such instructions, the jury could simply have found an agreement by Sears and Whirlpool to exclude Oreck from the sale of Whirlpool vacuum cleaners and, *on that basis*, have found them guilty (as it in fact did) of a *per se* violation of § 1 of the Sherman Act. Yet the very same con-

**4.** Count 2 of the complaint charged that Whirlpool and Sears unlawfully conspired to exclude Oreck from the vacuum cleaner market in Canada. (Counts 3 through 7 were dismissed.) At trial, Oreck contended that Whirlpool's refusal to grant its request that Whirlpool procure Canadian Standards Association approval for the "Whirlpool" vacuum cleaners it desired to sell in Canada, provided substantial evidence of the unlawful conspiracy to remove Oreck's competition against Sears, selling its "Kenmore" machines through its subsidiary, Simpson-Sears Ltd., the sole distributor of Whirlpool-made products in Canada.

The 1963 and 1968 agreements between Whirlpool and Oreck both specifically stated that Whirlpool was appointing Oreck its exclusive distributor of certain "Whirlpool" products "for the United States of America and its possessions." The parties agree that this provision placed no restriction on the territory in which Oreck might sell goods purchased from Whirlpool. Whirlpool concedes that it refused to obtain Canadian Standards Association approval for the cleaners that Oreck was seeking to market in Canada, but argues that such approval was not a prerequisite to selling in Canada and that, in any event, Oreck sold vacuum cleaners in Canada during the period of its distributorship.

On this count, the trial judge instructed the jury that,

"Arrangements . . . restricting the territory in which a product may be resold are unreasonable restraints of trade in and of themselves . . . You need not determine whether such arrangements are reasonable, or whether they have an impact upon the marketplace, nor need you be concerned with the business or supposed economic justification for such arrangements . . . ."

In light of the decision of the United States Supreme Court in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), this instruction was incor-

rect. Efforts by a manufacturer to restrict the territory in which a distributor of its products operates are to be examined under the rule of reason standard. See *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.,* 572 F.2d 883 (1st Cir. 1978).

It is undisputed that Whirlpool was not required to obtain Canadian Standards Association approval for its vacuum cleaners as requested by Oreck. That its refusal to do so may have been based on an agreement with its existing Canadian distributor does not, of itself, create a violation of the antitrust laws. It must further be found that this agreement was anticompetitive in purpose or effect. See *Continental T.V., Inc. v. GTE Sylvania, Inc., supra; Quality Mercury, Inc. v. Ford Motor Co.,* 542 F.2d 466 (8th Cir. 1976), *cert. denied sub nom. Prestige Lincoln-Mercury, Inc. v. Quality Mercury, Inc.,* 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977); *Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *Schwing Motor Co. v. Hudson Sales Corp.,* 138 F.Supp. 899 (D.Md.), *aff'd,* 239 F.2d 176 (4th Cir. 1956), *cert. denied,* 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

The trial judge's failure to instruct the jury on this point was plain error. Moreover, it inevitably prejudiced the jury's consideration of the first count even though the matter of sales in the Canadian market was set out in the second count. In the evidence, in the arguments, and in the district court's charge, this incident was used as an example of the claimed unlawful activity by Whirlpool and Sears to keep Oreck from selling more vacuum cleaners and to destroy Oreck's competitive activities. Throughout the trial, Whirlpool's refusal to procure Canadian Standards Association approval for the vacuum cleaners Oreck desired to sell in Canada was characterized as a major part of the alleged Whirlpool/Sears conspiracy to violate the antitrust laws.

duct can constitute the granting of a perfectly legal exclusive distributorship or one, at least, whose legality must be judged under the rule of reason standard. *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); see also, *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), *overruled on other grounds, Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466 (8th Cir. 1976), *cert. denied sub nom. Prestige Lincoln-Mercury Inc. v. Quality Mercury, Inc.*, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Bay City-Abrahams Bros., Inc. v. Estee Lauder, Inc.*, 375 F.Supp. 1206 (S.D.N.Y.1974). On the instant reconsideration *en banc*, the issue is whether the *per se* standard, under which the trial judge charged the jury, was appropriate in light of the nature of the alleged Whirlpool/Sears agreement.

Oreck's argument that the district court was correct in instructing the jury to apply the *per se* standard in this case, rests principally on two assertions: first, that Whirlpool's decision not to renew Oreck's distributorship was motivated by a desire to eliminate the price competition which Oreck was offering to Sears; and second, that this effort by Sears and Whirlpool to restrain competition constituted a group boycott expressly forbidden by the holdings of the United States Supreme Court in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

With regard to the first of these points, it is undisputed that, at all times relevant, Sears was selling its "Kenmore" vacuum cleaners at prices *below* those charged by Oreck for comparable "Whirlpool" models. The complaint did not allege, the evidence at the trial did not show, and counsel in summation did not argue, that Whirlpool was attempting to maintain high resale prices for its products by conspiring with its distributors or that its actions toward Oreck were an effort to chastise a dealer for refusing to cooperate in a scheme to fix or maintain prices. Cf. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). The contracts entered into by Oreck and Whirlpool in 1963 and 1968 clearly stated that Oreck had the sole right to determine its selling prices.

▪ Oreck concedes that there was no Sears/Whirlpool agreement to fix prices, but argues that the elimination of its distributorship amounted to tampering with the price structure for vacuum cleaners, equally a *per se* violation.[5] See, *United*

---

**5.** Oreck introduced no evidence at trial to show that the purpose of Whirlpool's refusal to renew Oreck's distributorship was to give Sears the power to maintain the prices of its "Kenmore" machines at an artificially high level. Cf. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224-26 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Neither did Oreck submit evidence to show that Whirlpool machines had a sufficient share of the vacuum cleaner market to permit any of its dealers to exploit a dealer monopoly without feeling the pinch of interbrand competition. See the Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 237 n. 57 (1977). It appears from the record that there was effective competition in the vacuum cleaner business at the manufacturer level. When interbrand competition exists, it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product. See *Continental T.V., Inc. v. GTE Sylvania, Inc., supra*, at 52 n. 19. In order to prove a violation of § 1 of the Sherman Act, Oreck would have had to show that Whirlpool's agreement with Sears to eliminate Oreck's competition either promoted a Whirlpool monopoly in the vacuum cleaner industry, see *Quality Mercury, Inc. v. Ford Motor Co., supra*, at 470; *Fleischmann Distilling Corp. v. Distillers Co. Ltd.*, 395 F.Supp. 221 (S.D.N.Y. 1975); or gave Sears a market position from which it could raise retail prices even in the face of interbrand competition. See, ABA Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intrabrand Competition (1977), at 93 n. 380. The Whirlpool/Sears agreement should, therefore, have been examined under the rule of reason standard.

*States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 84 L.Ed.2d 1129 (1940). In its brief on rehearing *en banc,* Oreck refers to a so-called "edge effect," that is, that by continuing to lower its prices and thereby come closer to those of Sears, Oreck's price operated as a ceiling against any increases by Sears. Cf. *United States v. Penn-Olin Chemical Company,* 378 U.S. 158 at 173–74, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division [II],* 75 Yale L.J. 373, 405–410 (1966). This claim is unavailing in the present posture of this case. Because of the trial judge's incorrect instructions to the jury, it cannot be said that the issue of whether Oreck's distributorship was allowed to lapse in order to protect Sears from price competition was fairly submitted to the jury or decided by its verdict. Rather, because the trial judge failed to instruct the jury that it must find that the purpose or the effect of these agreements was to enable Sears to raise or to maintain its prices for "Kenmore" vacuum cleaners, the jury's verdict that Sears and Whirlpool violated § 1 of the Sherman Act is of no effect.

▬ Oreck alleged that its cancellation, by agreement of Whirlpool and Sears, was a "group boycott" under the rule of *Klor's Inc. v. Broadway-Hale Stores, Inc., supra,* and of *United States v. General Motors Corp., supra,* which treat such behavior as a *per se* violation of § 1 of the Sherman Act. This case, however, cannot be fitted into the category of group boycott cases. "While the boycott concept is infinitely expandable, the *per se* doctrine ought not to be." Sullivan, *Antitrust* 256 (1977), quoted in *Drayer v. Krasner,* 572 F.2d 348 (2d Cir. 1978), slip op. at 1253, 1265. It is important to distinguish between "horizontal" restraints, *i. e.* agreements between competitors at the same level of market structure, and "vertical" restraints, *i. e.* combinations of persons at different levels of the market structure, such as manufacturers and distributors. See *United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Horizontal restraints alone have been characterized as "naked restraints of trade with no purpose except stifling competition," *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products, see *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 54, 97 S.Ct. 2549. They are, therefore, to be examined under the *rule of reason* standard. See Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L. Rev. 979 at 985–87 (1977).

▬ In *Klor's,* the Supreme Court specifically noted that "this is not a case of . . . a manufacturer and . . . [its] dealer agreeing to an exclusive distributorship," 359 U.S. at 212, 79 S.Ct. at 709. The present case, involving as it does an alleged agreement between a single manufacturer and a single dealer, is, in essence, an exclusive distributorship controversy, and the "group boycott" doctrine, is, therefore, not applicable. Because Sears is a large company presumably selling a large number of vacuum cleaners does not, *ipso facto,* convert this case into a horizontal conspiracy warranting *per se* treatment.[6]

---

**6.** Oreck seeks to distinguish the line of cases upholding the legality of agreements by which a manufacturer substitutes one exclusive distributor for another or terminates a distributor in order to afford another exclusive selling rights, see, *e. g., Quality Mercury, Inc. v. Ford Motor Co., supra; Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.,* 459 F.2d 138 (6th Cir. 1972); *Alpha Distributing Co. of Calif. v. Jack Daniel Distillery,* 454 F.2d 442 (9th Cir. 1972), *cert. denied,* 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974); *Packard Motor Car Co. v. Webster Motor Car Co., supra;* on the ground that Sears did not replace Oreck as the distributor of "Whirlpool" vacuum cleaners; and, therefore, competition of both an interbrand and intrabrand nature was eliminated.

Cf. *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 58 n. 28, 97 S.Ct. 2549.

Moreover, in his instructions to the jury, the trial judge failed to marshal any of the evidence presented by Whirlpool to show that its refusal to renew Oreck's distributorship was motivated by legitimate business concerns[7] and that its actions were consistent with the terms of the 1968 contract. It is the contractual nature of the dealings between Oreck and Whirlpool which distinguish this case from the holding of *United States v. General Motors Corp., supra,* relied upon by Oreck. In *General Motors,* the Court focused on the extra-contractual and price-fixing aspects of General Motors' activities in eliciting from dealers in the Los Angeles area agreements, substantially interrelated and interdependent, that none of them would do business with price discounters. 384 U.S. at 144, 86 S.Ct. 1321. The Court pointed out that what resulted from the activities of General Mo-

tors was "a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of franchised dealers to select their own methods of trade and to provide multilateral surveillance and enforcement," *id.* at 144, 86 S.Ct. at 1330; and that these activities could hardly be described as "unilateral" or merely "parallel." *Id.* at 145, 86 S.Ct. 1321. It was this same concerted action by businessmen to boycott other traders and thereby deprive them of access to all sources of merchandise which they wished to sell to the public, which led to the results reached in *United States v. Parke, Davis & Co., supra* ; and *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra.* Cf. *Beckman v. Walter Kidde & Company,* 316 F.Supp. 1321, 1327 (E.D.N.Y.1970), *aff'd,* 451 F.2d 593 (2d Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

What is crucial here is to consider those actions which General Motors could have

---

While it is true that, because of its unique facts, this case does not fit exactly into the dealer substitution line of cases, appellee's argument does not persuade us that it therefore comes within the rule of *per se* illegality. It may be argued that there were alternative sources of supply available to Oreck and that the net effect of Whirlpool's decision to allow Oreck's distributorship to lapse was *to add* an interbrand competitor to Whirlpool-made machines in the upright vacuum cleaner market. Moreover, it appears from the record that, while Sears sold several models of Whirlpool-made vacuum cleaners under its "Kenmore" label, Oreck was allowed to market only one model under the terms of the 1968 agreement, thereby reducing the potential for intrabrand competition in Whirlpool-made machines. In the absence of a showing of an anticompetitive purpose or effect, the fact that Sears may have asked to be made the sole distributor of a certain line of products (in this case, *Whirlpool*-made vacuum cleaners), does not render Whirlpool's subsequent action in refusing to renew Oreck's distributorship illegal. Cf. *Federal Trade Commission v. Raymond Bros.-Clark Co.,* 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448 (1924); *Packard Motor Car Co. v. Webster Motor Car Co., supra.*

The rule of reason provides a more discriminating way of differentiating true exclusive dealerships from two-firm vertical combinations to exclude a distributor from supply. Although Oreck asserts that Whirlpool's refusal to renew its distributorship was against Whirl-

pool's own economic interests, the trial court's instructions to the jury, under the *per se* rule, did not require the jury to balance the anticompetitive evils and pro-competitive virtues of the alleged vertical Sears/Whirlpool agreement, as would have been done under the rule of reason. See *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 57 n. 27, 97 S.Ct. 2549; Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977, 77 Colum.L.Rev. 979 at 983 (1977). "*Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive," *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* at 49–50, 97 S.Ct. 2549, 2558; and where the conduct involved is an agreement between a single manufacturer and a single distributor which results in a sole distributorship for the manufacturer's products, a careful inquiry into the business justifications for the agreement · is required.

7. The evidence presented at trial by both parties revealed several instances of Oreck's alleged disregard for the terms of its contract, *e. g.,* refusal to modify advertising campaigns in accordance with Whirlpool's wishes, sales to private label customers, and failure to abide by the original marketing strategy of distribution to major retail accounts; any one of which could have justified Whirlpool's refusal to renew Oreck's distributorship. In addition, the 1968 contract itself contained no provision for renewal.

taken, but did not, to discourage the sale of cars to discounters, which the Court characterized as being "wholly unilateral conduct, the validity of which under the antitrust laws was assumed, without being decided in *Parke, Davis, supra.*" *United States v. General Motors, supra,* 384 U.S. at 144, 86 S.Ct. at 1330. After describing the efforts of the Losor Chevrolet Dealers Association to enlist the aid of General Motors, the meetings between General Motors personnel and local dealers at which General Motors elicited from each dealer a promise not to do business with the discounters, and the collaboration among the dealers and with General Motors to enforce these promises, the Court went on to state,

"Nor did General Motors confine its activities to the *contractual boundaries* of its relationships with individual dealers. As the trial court found (Finding 39), General Motors at no time announced that it would terminate the franchise of any dealer which furnished cars to the discounters. The evidence indicates that it had no intention of acting in this *unilateral fashion.* On the contrary, overriding corporate policy with respect to proper dealer relations dissuaded General Motors from engaging in this sort of *wholly unilateral conduct,* the validity of which under the antitrust laws was assumed, without being decided, in *Parke, Davis, supra.*" (Emphasis added and footnotes omitted.) 384 U.S. at 143–144, 86 S.Ct. at 1329–30.

The General Motors Dealer Selling Agreement provided that a dealer's franchise could be terminated if the dealer attempted to establish a second and unauthorized sales outlet or location. Without deciding the question, the Court indicated that had General Motors considered that the conduct of a dealer selling to price discounters violated the terms of the Dealer Selling Agreement, it could lawfully have terminated the franchise. The Court nowhere suggests that action by General Motors in accordance with this contract would have been any less unilateral, or any less lawful, because it was taken in response to complaints by competing dealers. Cf. *Federal Trade Commission v. Raymond Bros.-Clark Company,* 263 U.S. 565 (1924). Unlike *General Motors,* the parties in this case introduced no proof that Whirlpool took any action that was not in accord with the terms of its 1968 contract. Whirlpool contends that Oreck was fully aware that its distributorship would cease in December, 1971, regardless of whether or not its efforts to compete against Sears and other vacuum cleaner dealers were successful. The principle that unilateral refusals to deal do not *per se* suppress competition is not altered by the fact that the cut-off distributor has been a "successful dealer" or that its business is damaged. See *Bay City-Abrahams Bros., Inc. v. Estee Lauder, Inc., supra; Top-All Varieties, Inc. v. Hallmark Cards, Inc.,* 301 F.Supp. 703 (S.D.N.Y.1969).

And yet, the trial court made no attempt to balance its charge on the effect of the alleged Whirlpool/Sears conspiracy with a reference to the evidence introduced at trial that Whirlpool's decision not to renew Oreck's distributorship was an exercise of its contractual rights. It has always been the prerogative of a manufacturer to decide with whom it will deal. See *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465 (1919). Any alleged inducements by Sears to Whirlpool to allow the contract with Oreck to expire may have amounted to tortious interference; but, without some further showing that from this course of conduct there was an anticompetitive effect in the vacuum cleaner industry as a whole, it is inconsistent with the sanctity of contractual arrangements to allow the antitrust laws to inject a provision into the agreement which would require Whirlpool to renew Oreck's distributorship for as long as it is able to compete successfully with Sears. In this case, therefore, something more than an agreement between Whirlpool and Sears to eliminate Oreck must be shown. The agreement becomes violative of § 1 of the Sherman Act only if it is *anticompetitive in purpose or effect* —in sum, it must be tested by the rule of reason. Without any consideration of the anticompetitive purpose or effect, arbitrarily seeking to protect Oreck simply because Whirl-

pool refused to renew a contract with Oreck which had terminated by its own terms, even though this refusal was in whole or in part, due to persuasion by Sears, disregards the well established rule that "the antitrust laws . . . were enacted for 'the protection of *competition, not competitors* . . . .' "

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). (Emphasis in original.)

The judgment of the district court, based as it is on a finding of liability on the part of Whirlpool and Sears, is reversed and the case is remanded for a new trial. In so doing, we express no opinion as to the correctness of those portions of the trial court's instructions dealing with the formulation of damages.

MANSFIELD, Circuit Judge, dissenting in an opinion in which FEINBERG, Circuit Judge, concurs.

This antitrust appeal turns on two major interlocking issues, one factual and the other legal: (1) Did Whirlpool and Sears combine and conspire to oust Oreck as a competitor of Sears in the sale of Whirlpool-made vacuum cleaners? (2) If so, should the conspiracy be treated as *per se* illegal? In my view both questions must be answered affirmatively. Therefore, I dissent.

The majority opinion is based on certain materially mistaken premises. It assumes (1) that the complaint charges only a general conspiracy "to exclude Oreck from the vacuum cleaner market in the United States and Canada" (Maj.Opin. p. 128, *supra* ). (2) that Oreck's case rested solely upon Whirlpool's failure to renew its agreement for distributorship of Whirlpool vacuum cleaners and parts, possibly as the result of "inducements by Sears" which "may have amounted to tortious interference" (Maj.Opin. p. 133), and (3) that the jury credited the testimony of one or two Whirlpool officers regarding Whirlpool's reasons for termination of its agreement with Oreck rather than the evidence offered by Oreck (Maj.Opin. p. 128; n.2).

Only on the basis of these erroneous assumptions is the majority able to conclude that the termination of the Whirlpool-Oreck distributorship agreement did not constitute a *per se* violation of § 1 of the Sherman Act, and that there could be no violation of that Act in the absence of proof of a restraint of "trade unreasonably in the vacuum cleaner industry in the United States and/or Canada." However, when the case is viewed in the light of (1) the issues framed by the pleadings, (2) the evidence presented at trial (including the inferences which the jury could reasonably have drawn from that evidence), and (3) the applicable principles of antitrust law as charged by the trial judge, the reversal is unwarranted.

Turning first to the complaint, the First Claim alleges essentially a conspiracy between Whirlpool and Sears to restrain Oreck from competing against Sears in the sale of Whirlpool-made vacuum cleaners, attachments and parts. It is claimed that pursuant to a written Whirlpool-Oreck distributorship agreement dated August 7, 1963, Oreck invested substantial funds, time and effort in building up a successful sales and service organization for the distribution of Whirlpool vacuum cleaners and that Oreck's success enabled it "to compete seriously" with Sears, the pre-existing and only other distributor of Whirlpool-made vacuum cleaners, which sold the cleaners under the "Kenmore" label. (Compl. ¶ 14). The complaint further alleges that as a result of Oreck's successful competition against Sears, Whirlpool was induced by Sears, its major distributor, to "eliminate any serious competition to Sears, Roebuck from Oreck" (¶ 15) and to combine and conspire with Sears "to deprive Oreck of its market for the sale of vacuum cleaners, attachments and parts under the Whirlpool name and label" (¶ 25). The conspiracy was allegedly carried out by (1) forcing Oreck in 1968 to reduce its distributorship to "two Whirlpool products, one vacuum cleaner and one set of attachments to a different vacuum cleaner," (2) limiting or cutting off from Oreck replacement parts, tools, drawings, improvements and modifications for Whirlpool

vacuum cleaners, and (3) forcing or persuading suppliers not to furnish vacuum cleaner components to Oreck, all "with the intent and effect of foreclosing Oreck from numerous customers and potential customers and reducing Oreck's competition with Sears, Roebuck." (¶ 21). The purpose and effect of the alleged conspiracy is then stated as follows:

"25. The purpose and effect of such contracts, combinations or conspiracies, and each of them, have been to deprive Oreck of *its market for the sale of vacuum cleaners, attachments and parts under the Whirlpool name and label,* and Oreck has substantially lost such market as a result of the actions referred to above.

"26. The purpose and effect of such contracts, combinations or conspiracies, and each of them, have *also* been substantially to exclude Oreck from the market for vacuum cleaners, attachments and parts in the United States and its possessions, and to lessen competition in such market." (Emphasis added).

Thus, although the complaint includes allegations of restraint of trade in vacuum cleaners generally in the United States and Canada, it charges primarily a conspiracy to deprive Oreck of the sale of Whirlpool cleaners in competition with Sears. The case was tried on the latter basis and if the plaintiff succeeded in proving a conspiracy limited to the objective alleged in ¶ 25, it would be entitled to recover without proving the broader claims in ¶ 26 that it was excluded from the sale of vacuum cleaners of any kind in the United States. *United States v. General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207,

79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Silver v. N. Y. Stock Exchange,* 373 U.S. 341, 348, n.5, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

The Second Claim of the complaint (the only other pertinent claim for present purposes) adds to the foregoing allegations the charge that Sears and Whirlpool also conspired "to prevent Oreck from selling vacuum cleaners and other Whirlpool products in Canada." [1]

From the outset it was recognized that Oreck could not establish an unreasonable restraint in the distribution of vacuum cleaners generally in the United States, since Whirlpool cleaners represent but a small percentage of the entire market. As a practical matter, therefore, the issue tried was whether Sears and Whirlpool had combined to restrain Oreck's competition against Sears by precluding Oreck from selling Whirlpool-made vacuum cleaners, attachments and parts. The record, which must at this stage be viewed most favorably to Oreck, *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), discloses more than ample evidence to establish this specific and limited conspiracy. Since 1925 Sears has been the principal distributor of Whirlpool products, currently purchasing more that two-thirds of Whirlpool's total appliance production and, at the time of the events here involved, more than 90% of Whirlpool's vacuum cleaner output for resale under Sears' "Kenmore" label. In addition Sears, beginning in 1925, purchased a substantial block of Whirlpool's common stock and by 1960 became its largest single shareholder, owning 251,192 shares and usually electing one or more of its executives to Whirlpool's board of directors. Senior officers of Sears sometimes became Whirl-

---

1. Insofar as the claim alleged in Count Two was presented to the jury as charging the defendants with an unlawful vertical location restriction, I agree with the majority that *Continental T. V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which was *not* decided until almost a year after Judge Owen instructed the jury in this case, now requires trial courts to make a preliminary determination of whether a particular challenged restraint warrants *per se* treatment or

should be judged according to the rule of reason.

Judge Owen did not make this preliminary determination. However, I do not agree with the majority that Judge Owen's charge on this point necessarily prejudiced the jury's consideration of the evidence relating to Count One, since the jury verdict on that Count was supported by abundant evidence independent of the proof concerning Whirlpool's resistance to Oreck's desire to enter the Canadian market.

pool executives. Sears, therefore, has been in a position to exercise considerable leverage over Whirlpool's sales and distribution policies and decisions.

Prior to the formation of Oreck in 1963, Whirlpool had periodically attempted to broaden the sales of its vacuum cleaners by marketing them under its own brand name, but had found that its existing distribution network was inadequate and that Sears' sales of Whirlpool-manufactured vacuum cleaners at high retail prices posed a barrier to Whirlpool's entry into price competition against other brands as long as its relationship with Sears deterred it from competing against Sears in the sale of Whirlpool-made machines. As a result, Whirlpool in 1961 discontinued efforts to sell its product independently under its own name and H. Thomas Stroop, a Whirlpool executive, prepared a report entitled "Appraisal of Vacuum Cleaner Business—RCA Whirlpool." He concluded that:

"Unlike other appliances, Sears sells their [vacuum] cleaners for a high or higher prices than major brand competition. . . . .

"Sears becomes very unhappy if RCA Whirlpool product is retailed for less than Sears product manufactured by Whirlpool. For this reason, we understand that it has been decided that the RCA Whirlpool brand should have retail prices comparable to Sears.

"Our challenge then . . . 'Can we sell cleaners in volume at high retail prices . . . and if so how?'" (Pl. Ex.160).

Thereafter, until the events giving rise to this case, Whirlpool-made vacuum cleaners were sold to the public only by Sears.

In April, 1963, Whirlpool's interest in selling its vacuum cleaners under its own brand name was revived. Jack Sparks, Vice President of Whirlpool, approached David Oreck, who prior to 1961 had been in charge of Whirlpool vacuum cleaner sales for "Bruno New York" and had been the most successful distributor of Whirlpool

vacuum cleaners under its own brand name before Whirlpool discontinued such sales. Sparks and Oreck agreed that the newly-formed Oreck Corporation, plaintiff-appellee, would function as the exclusive United States distributor of Whirlpool brand vacuum cleaners. Sparks advised Oreck that he was "not to conflict with Sears, Roebuck on price" and an internal Whirlpool letter confirmed that Oreck's prices would "emphasize specialty [i. e., high-priced] selling."

Oreck soon found that it could operate profitably only by selling Whirlpool-made vacuum cleaners through direct mail or institutional supply houses, which would, by reducing or eliminating the middleman's mark-up, enable Oreck to sell competitively. Accordingly, in 1967 Oreck began a large-scale mail solicitation campaign which dramatically increased its sales of Whirlpool machines from a low in 1967 of 8,384 units to an all-time high of 78,203 units in 1971, the year Whirlpool terminated its distributorship. Oreck planned to realize its profits principally from the sale of dust bags and accessories over the 10–15 year life of the product. Despite the prospects for increased mail order sales, which actually developed, three Whirlpool executives—Jack Sparks, Sol Sweet and John Payne, Whirlpool's primary contact with Oreck—all expressed disapproval of Oreck's mail order campaign, Payne advising Oreck that Whirlpool's unhappiness was attributable to the company's "other customer" (Sears), which did not like the mail solicitation. Indeed, Sid Boyar, a Sears vice-president and director who was also a director of Whirlpool, forwarded to Whirlpool an Oreck mail solicitation for sale of Whirlpool machines, with a note advising that this "type of selling gave Whirlpool a bad name." Payne also told Oreck that the "other customer [Sears] got to the head of the company [Whirlpool]." As a mail order house, Sears might be adversely affected by Oreck's solicitation of mail order business for vacuum cleaners made by the same company (Whirlpool), which were similar in appearance and design to those sold by Sears.[2] Moreover,

---

2. Indeed, despite minor differences, the machines sold by Oreck were so similar to those sold by Sears that they were characterized by an expert as "the same."

although Oreck had originally concentrated on sale of the higher-priced "top-of-the-line" Whirlpool machines, after it shifted to mail order sales and sales to institutional supply houses, its prices for the Whirlpool upright units (which it sold in these markets) were lowered.

That a Whirlpool-Sears combination had been formed to stop Oreck's competition against Sears was further evidenced by events during the preceding year, 1966, when David Oreck sought to obtain Whirlpool's approval of Oreck's plan to market in Canada, where Sears operated under the name of Simpson-Sears Ltd. Whirlpool refused to make the minor changes in the Whirlpool vacuum cleaner necessary to conform to Canadian Standards Association requirements, as Whirlpool had done for Sears, and Payne later wired Oreck that it could not market in Canada because Whirlpool could not "obtain a waiver to the current franchise," meaning approval by Sears.

By 1968 the Whirlpool-Sears combination was putting pressure on Oreck to force it to lessen its competition against Sears. In that year Whirlpool refused to manufacture private label vacuum cleaners for certain of Oreck's large customers, and Payne attributed the refusal to "objections from our customer    . . .", which could be interpreted by the jury as obviously referring to Whirlpool's only other customer, Sears. When Oreck persisted, Payne eventually advised him that "another vacuum cleaner customer" had informed Whirlpool that "they are not interested in having another competitor in the vacuum cleaner business." In 1969 and 1970, Whirlpool refused to make minor changes in Oreck's shipping carton to meet parcel post requirements and thereby avoid a penalty charge, even though Whirlpool had provided Sears with an acceptable box for its mail orders. Payne, who handled the matter, attributed the refusal not to engineering difficulties but to a "corporate" decision.

On December 31, 1971, despite Oreck's highest sales level since it had begun selling Whirlpool vacuum cleaners, Whirlpool terminated the Oreck distributorship. Whirlpool witnesses conceded at trial that Oreck was "doing a nice job, no question about that" and "we had no argument with the amounts he was selling." Yet, immediately following the termination, Whirlpool refused to sell Oreck 30,000 units in inventory at $30 each on a cash basis but sold them instead to third parties at $15 per unit.

The foregoing, together with other evidence and witnesses viewed by the jury, supported the jury's conclusion that Whirlpool terminated Oreck as the result of the combined efforts of Sears and Whirlpool to put an end to Oreck's competition against Sears in the sale of Whirlpool machines, including mail-order solicitation, to which Sears objected because of the possible adverse effect on its sale of Whirlpool vacuum cleaners under its own label in the United States and Canada. No substantial evidence was offered to show that Oreck was terminated for some possibly lawful reason, such as failure to increase Whirlpool sales or Whirlpool's desire to protect its trade name, other than testimony of Jack D. Sparks and John Payne that Oreck had failed to market to "major accounts." This purported rationale for the termination was understandably rejected by the jury in view of the tremendous increase in Oreck's sales of Whirlpool cleaners from 1967 to 1971.

With the foregoing allegations and evidence before him, the trial judge instructed the jury

"[T]hat in order to recover under Count 1 Oreck has the burden of proving each of the following propositions:

"That Whirlpool and Sears combined or conspired to exclude Oreck from the market for Whirlpool vacuum cleaners, *or* from the vacuum cleaner market generally in the United States and its possessions and to lessen the competition in either of these markets.

"Two. That as a result of said combination or conspiracy Oreck was partially or wholly excluded from the vacuum cleaner market as I have described above.

"Three. That as a proximate result of said exclusion Oreck in fact suffered damage." (Emphasis supplied).[3]

On the evidence and this instruction the jury could have found that Oreck had by a preponderance of the evidence established the more specific and limited conspiracy alleged in its First Claim, namely, a combination between Whirlpool and Sears to eliminate Oreck as a competitor of Sears in the distribution of Whirlpool vacuum cleaners, parts and attachments. Indeed, the majority virtually concedes this, stating:

"Under such instructions, the jury could simply have found an agreement by Sears and Whirlpool to exclude Oreck from the sale of Whirlpool vacuum cleaners and, *on that basis*, have found them guilty (as it in fact did) of a *per se* violation of § 1 of the Sherman Act. . . . On the instant reconsideration *en banc*, the issue is whether the *per se* standard, under which the trial judge charged the jury, was appropriate in light of the nature of the alleged Whirlpool/Sears agreement." (Maj.Opin. pp. 129–130) (Emphasis in original).

Accepting the legal issue as framed by the majority, the answer is furnished in clear and unmistakable terms by a long line of Supreme Court decisions consistently holding that where two or more competitors agree to cut off supplies to a third, such a combination or agreement to boycott is sufficiently pernicious in its purpose and effect to be unreasonable *per se* and hence illegal without the necessity of inquiring into the precise economic harm in the market caused by the agreement or into the amount of commerce affected. *United States v. General Motors*, 384 U.S. 127, 145-46, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (agreement between GM and its Chevrolet dealers to cut off supply to price-discounters selling Chevrolets); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (conspiracy between one merchant and suppliers to deprive competing merchants of goods); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Such a combination "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy," *Klor's, supra*, 359 U.S. at 213, 79 S.Ct. at 710 (footnote omitted).

"[W]here businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. See Barber, Refusals To Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 872–885 (1955). Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be directed—as in *Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n, supra*, at 468 [61 S.Ct. 703 at 708]." *United States v. General Motors, supra*, 384 U.S. at 146–47, 86 S.Ct. at 1331.

"The manufacturer may discontinue an exclusive distributorship or may refuse to renew an exclusive distributorship for business reasons which are sufficient to the manufacturer alone and any adverse effect such a decision may have upon the business of the distributor is immaterial *in the absence of any arrangement or conspiracy restraining trade or competition*." (Tr. 1839.(emphasis supplied)).

---

**3.** It is noteworthy that no objection was made to these jury instructions at trial, nor did the defendants claim that the charge was erroneous in their appeal from the jury's verdict.

The majority contends that Judge Owen's charge was defective in that it allowed the jury to find antitrust liability on evidence that amounted to no more than "a perfectly legal exclusive distributorship." (Maj.Opin. p. 130). Judge Owen properly instructed the jury on this point. His charge states:

The present case is governed by these basic principles. The jury found that Whirlpool, a large manufacturer of appliances, including vacuum cleaners, combined with Sears, Roebuck, a merchandising giant that depended on mail order business and had for 40-odd years distributed the lion's share of Whirlpool's entire output, to stop Oreck, the only other distributor of Whirlpool-made vacuum cleaners, from competing against Sears in the sale of Whirlpool-made machines.

Before Oreck was terminated by the Sears-Whirlpool combination as a competing distributor, the public had the benefit of Oreck's competition, including price competition, in the marketing of Whirlpool cleaners, the sales of which had been dramatically increased by Oreck from 8,384 units to 78,203 units in the preceding four years, resulting in profits to Whirlpool and Oreck.[4] After the termination the public could buy Whirlpool machines only from Sears at such prices as Sears might decide, unaffected by any Oreck competition.

The majority's legalization of this Whirlpool-Sears conspiracy on the theory that "something more than an agreement between Whirlpool and Sears to eliminate Oreck must be shown" (Maj.Opin. p. 133), and that Whirlpool could lawfully have accomplished the same result by unilaterally exercising its contract right to terminate or not to renew, simply is unsupportable, either by logic or by precedent. Had Whirlpool not agreed with Sears to oust Oreck, as the jury found, Whirlpool not only could have, but probably would have, continued to distribute its product through Oreck, in view of the latter's outstanding success in selling Whirlpool cleaners during the four years immediately preceding the 1971 termination. As the jury found, the cutoff was directly attributable to the Sears-Whirlpool combination, not to any unilateral exercise by Whirlpool of its rights under its distribution contract with Oreck. The existence of a contract right to terminate Oreck does not create a mantle of protection against an anticompetitive agreement between a manufacturer and a distributor to terminate the distributor's sole competitor.

No one questions the right of a manufacturer unilaterally to terminate a distributorship, whether it be to maximize profits, improve a distribution system, or for some other legitimate reason, see, e. g., *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and a manufacturer is not precluded from acting on his own to substitute one exclusive distributor for another, *Alpha Distributing Co. v. Jack Daniels Distillery*, 454 F.2d 442, 452 (9th Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 98 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.D.C. 161, 243 F.2d 418, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.*, 459 F.2d 138 (6th Cir. 1972). The jury was so instructed.[5] But when the manufacturer agrees with one or more existing competitors of its distributor to cut off the distributor, as the jury found here, the resulting termination is unlawful, *United States v.*

---

**4.** Although my view of this case does not rest on Oreck's ability to compete with Sears pricewise, one aspect of the issue of price competition merits discussion. Oreck's initial brief on appeal strongly suggested in numerous places that the Sears-Whirlpool conspiracy was partly motivated by Sears' desire to eliminate Oreck because of the competition on prices that Oreck provided. These suggestions were not disputed by the defendants until the *en banc* briefs were filed.

My panel dissent mistakenly referred to Oreck's prices for Whirlpool-made vacuum cleaners as "lower" than the Sears prices for its Kenmore version of the same cleaners. The important point, however, is not which cleaners were higher-priced, but whether Sears encountered serious competition from Oreck that motivated it to prevail upon Whirlpool to terminate Oreck. The evidence showed that Oreck was a vigorous competitor, especially in the last years of its distributorship, when its sales rose dramatically. Also, it is undisputed that by 1970, 90% of Oreck's sales were from mail order solicitations, a traditional preserve of Sears.

**5.** See note 3, *supra*.

General Motors Corp., supra; Klor's, Inc. v. Broadway-Hale Stores, supra; E. A. McQuade Tours Inc. v. Consolidated Air Tour Manual Comm., 467 F.2d 178, 186–87 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); Barber, Refusals To Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 875 (1955), and cannot be saved by using an otherwise lawful means of termination to carry out an anticompetitive agreement. See Poller v. Columbia Broadcasting System, 368 U.S. 464, 468–69, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

These basic principles were accepted at trial by Whirlpool's counsel in a recorded exchange with Judge Owen regarding the instructions to be given by him to the jury:

"The Court: I understand that, but it seems to me that if the jury were to conclude that Sears and Whirlpool had conspired to terminate Oreck to rid Sears of a competitor, they have gone all the farther that they need to go.

"Mr. Turoff [Whirlpool's counsel]: I see now your Honor's argument. I think what you are saying is that if the jury finds that we had a conspiracy for the purpose of getting rid of Oreck, that is an unreasonable restraint of trade. That is, I think, a correct statement of the law."

In view of the jury's finding of just such a conspiracy, no basis exists for Judge Anderson's statement (Maj.Opin. p. 133) that "Any alleged inducements by Sears to Whirlpool to allow the contract with Oreck to expire" may have amounted merely to "tortious interference," and that it would therefore be "inconsistent with the sanctity of contractual arrangements" to require Whirlpool to renew Oreck's distributorship. The Whirlpool-Sears agreement to "terminate Oreck to rid Sears of a competitor" was not only a "tortious interference" but also a per se unreasonable restraint of competition. United States v. General Motors Corp., supra; Klor's, Inc. v. Broadway-Hale Stores, Inc., supra.

Nor can the boycott here be legalized on the technicality that it is "vertical" because only one horizontal competitor, Sears, was a member of the conspiracy. It is the participation of this competitor, incidentally one of the country's merchandising giants, with some 2,800 stores and sales offices, that renders illegal the boycott of Oreck by establishing that the Whirlpool-Sears agreement was anti-competitive and designed to benefit Sears at the expense of its competitor, Oreck. Once that objective was shown, the number of the conspirators and their posture—whether vertical or horizontal—has no legal significance. See, e. g., General Motors, supra, where the boycott depended for its success upon vertical conspiratorial efforts by one manufacturer, as here. Moreover, the harmful effect on the victim of the boycott—in this case Oreck—does not depend on the existence of more than one competitor but upon the anticompetitive agreement between the competitor and the supplier.[6]

Finally, the majority places heavy reliance on Continental T. V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which was decided approximately one year after the jury rendered its verdict in this case. In Sylvania the Supreme Court held that the potential harm from nonprice vertical restrictions is insufficient to warrant as a general rule their classification as per se illegal, and that the legality of such commercial practices must be judged by a "rule of reason," unless the particular challenged practice is shown to have a "pernicious effect on competition" and to lack "any redeeming virtue." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

While the Sylvania holding indicates that the trend in antitrust doctrine may be toward increasing application of the rule of reason over the per se approach, the decision is largely irrelevant to this case, which involves a boycott, not a vertical restriction.

6. As Professor Sullivan observed in his discussion of the per se approach to group boycotts, "it is conceivable that only a single firm at the blockaded level [Sears] may succeed in coercing or inducing . . . one important supplier [Whirlpool] . . . from dealing with one or more would-be competitors [Oreck]. . . . Such an arrangement would display all essential elements of a boycott." Sullivan, Antitrust, 231, n.1 (1977).

*Sylvania* leaves intact the justification and standard for the creation of *per se* rules, as articulated in *Northern Pacific, supra,* and the boycott in this case meets that standard. No redeeming virtue has been asserted to justify the conspiracy between Whirlpool and Sears to terminate Oreck, as found by the jury; nor has it ever been suggested that benefits to the marketplace will result from this conspiratorial termination. Moreover, the harm to intrabrand competition in the sale of Whirlpool-made vacuum cleaners is both immediate and apparent, with no countervailing stimulation of intrabrand competition, the usual saving grace of a vertical restraint.

Until the Supreme Court decides that a boycott ought not to be evaluated according to the *per se* rule, I would hold that a combination or conspiracy of two or more persons or entities to eliminate a competitor is *per se* illegal under § 1 of the Sherman Act. The jury's conclusion that such a conspiracy existed in this case is supported by the evidence. Therefore, I would affirm.